MR. JUSTICE SHEEHY,
dissenting:
This is the blackest judicial day in the eleven years that I have sat on this Court. Indeed it may be the blackest judicial day in the history of the state. Certainly this decision is more regressive than the ill-boded Ashcraft v. Montana Power Company (1971), 156 Mont. 368, 480 P.2d 812 case, which deprived injured workers of their full legal redress against third party tortfeasors. The decision today cleans the scalpel for the legislature to cut away unrestrainedly at the whole field of tort redress. Perhaps worse by this decision today, the Court throws in the sponge as a co-equal in our tripartite state government.
I.
For the reader to understand the drastic ramifications of the “Wrongful Discharge From Employment Act” the whole of the Act must be set out. The legislation passed as Ch. 641, Laws of Montana *53 (1987). A full copy of the text is attached to this dissent as Exhibit A. The bracketed numbers thereon indicate the present number of the code sections of the Act as they now appear in Montana Code Annotated.
The contraction of what was once in this state the tort of wrongful discharge is found principally in three sections of the Act, Section 4 [ § 39-2-904, MCA], Section 5 [ § 39-2-905, MCA] and Section 8 [ § 39-2-913, MCA].
Under Section 4 of the Act [ § 39-2-904, MCA] grounds for wrongful discharge are limited to three possibilities:
“(1) It was in retaliation for the employees refusal to violate public policy or for reporting a violation of public policy;
“(2) The discharge was not for good cause and the employee had completed the employers probationary period of employment; [under the Act, a probationer has absolutely no right of recourse for a wrongful discharge] or
“(3) The employer violated the express provisions of its own written personnel policy.”
The attorneys in this case supporting the Wrongful Discharge From Employment Act filed briefs claiming that it provided great new rights for discharged workers. Not true. Each of the elements listed above was established by this Court in decisions heretofore made and each was fully available to wrongfully discharged employees, including probationers. Thus, the first element was recognized in Keneally v. Orgain (1979), 186 Mont. 1, 606 P.2d 127, where we said:
“. . . It is only when a public policy is violated in connection with the wrongful discharge that the cause of action arises. Examples given by the courts are: refusal to perjure himself in the case of one employee; firing of another employee for asserting a right to obtain Workers’ Compensation benefits to which he was statutorily entitled; and refusal of sexual relations.”
Id., 186 Mont, at 6, 606 P.2d at 129.
As to the second element, where the discharge of the employee was not for good cause, we had protected the employee in cases before the adoption of this Act. In Ameline v. Pack and Company (1971), 157 Mont. 301, 45 P.2d 689, this Court found that the employer had not established good cause in the termination of an employee before the end of his one-year contract. Our recent cases of Prout v. Sears Roe Buck and Co., (Mont. 1989), [236 Mont. 152,] 772 P.2d 288, 46 St.Rep. 257, and Hobbs v. Pacific Hide and Fur (Mont. 1989), [236 *54 Mont. 503,] 771 P.2d 125, 46 St.Rep. 544, confirmed that a discharge must be for good cause after the probationary period has elapsed. These and other cases relied on the implied covenant of good faith and fair dealing.
The third element for which wrongful discharge is granted under the Act is if the employer violates the express provisions of its own written personnel policy. Here again, the legislature granted nothing that had not already been firmly established in our decisions. In Dare v. Montana Petroleum Marketing Company (1984), 212 Mont. 274, 687 P.2d 1015 (Weber, J.), we held that even an employment handbook promulgated by the employer was not essential for a cause of action for a breach of the implied covenant of good faith and fair dealing stating that:
“. . . [A]n employee is protected from bad faith or unfair treatment by the employer to which the employee may be subject due to the inherent inequality of bargaining power present in many employment relationships . . .”
Id., 68 P.2d at 1020, 212 Mont, at 282.
Violation of the employer’s handbook procedures for termination which gave rise to a wrongful discharge action was firmly established in Gates v. Life of Montana Insurance Company (1982), 196 Mont. 178, 638 P.2d 1063, and Gates v. Life of Montana Insurance Company (1983), 205 Mont. 304, 668 P.2d 213. We followed that rule in Stark v. Circle K Corporation (1988), [230 Mont. 468], 751 P.2d 162; and Kerr v. Gibson’s Products Company of Bozeman (Mont. 1987), [226 Mont. 69], 733 P.2d 1292 (Turnage, J.); Flanigan v. Prudential Savings and Loan Association (1986), 221 Mont. 419, 720 P.2d 257; Krenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487;
The elements of wrongful discharge, as found in the Act, therefore, are but restatements of cases based on some judicial policy heretofore promulgated by this Court. While perforce, the legislature had to recognize at least those three elements of wrongful discharge, it took care to provide that no significant amount of damages could be recovered by a wrongfully discharged employee even under those elements. A wronged employee’s remedies are nearly emasculated under the Act.
Section 5 of the Act [ § 39-2-905, MCA] describes the recoverable remedies for a wrongfully discharged employee. He or she may recover no more than four years of lost wages and fringe benefits from both of which are deducted amounts the employees earned or could *55 have earned with reasonable diligence during that period. Since Section 6 of the Act [ § 39-2-911, MCA] limits suits to one year from the date of discharge, the employee’s loss is wholly speculative.
Section 5 of the Act completely wipes out any right of any discharged employee to damages for pain and suffering, emotional distress, compensatory damages or any other form of damages except the four years of mitigated lost wages and fringe benefits. These stricken elements of damages are traditionally allowed against tortfeasors, elements which we have supported in any number of cases, as proper items of recovery.
Finally, to make certain that a wronged employee would have to take his or her lumps without a legal basis for proper recovery, the legislature adopted Section 8 [ § 39-2-913, MCA] which states that no claim for discharge may arise from a tort or express or implied contract except as provided in the Act itself. The real purpose of Section 8 is to negate by elimination any possible employee claim of tort based upon an implied covenant of good faith and fair dealing in the employment contract. This provision takes Montana out of the mainstream of American legal thought.
Restatement (Second) of Contracts, § 205, provides:
“Duty of good faith and fair dealing. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.”
The duty of “good faith” is incorporated in the Uniform Commercial Code [ § 30-1-201(19); § 30-1-208, MCA]. A large and important body of oil and gas law is based upon implied covenants contained in oil and gas leases and other instruments. This Court has recognized that an implied covenant of good faith and fair dealing attends insurance policies. First Security Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040; State ex rel. Larson v. District Court (1967), 149 Mont. 131, 136, 423 P.2d 598, 600. We have also found a remedy for the breach of the implied covenant in the employment cases noted above, in Dare v. Montana Petroleum Marketing Company (1984), 212 Mont. 274, 687 P.2d 1015; in the attorney-client relationship, Morse v. Espeland (1985), 215 Mont. 148, 696 P.2d 478; and in the dealings by banks with their customers, Tribby v. Northwestern Bank of Great Falls (1985), 217 Mont. 196, 704 P.2d 409; First National Bank in Libby v. Twombly (1984), 213 Mont. 66, 689 P.2d 1226. We found an implied covenant of good faith and fair dealing in real property lease agreements in Nicholson *56 v. United Pacific Insurance Company (1985), 219 Mont. 32, 710 P.2d 1342.
The implied element of “good faith” connotes a moral quality “honesty of person, freedom from. fraudulent intent, and faithfulness to duty or obligation.” Raab v. Casper (1975), 124 Cal.Rptr. 590, 51 Cal.3d 866; Restatement (Second) of Contracts, § 205.
The nature and extent of an implied covenant of good faith and fair dealing is measured in any particular contract by the justifiable expectations of the parties to the contract. Nicholson, supra.
The approval by this Court in this case of the elimination by the legislature of the element of good faith and fair dealing in employment contracts has the effect of reversing all of the employment cases this Court has handed down in the last decade. The elimination has a profound effect on the recovery of punitive damages. Although the Act here in question provides [Section 5(2)] for punitive damages in case of actual fraud or actual malice on the part of the employer, unless an employee can show an implied covenant of good faith and fair dealing in his employment contract, he will find no basis upon which punitive damages can be awarded to him.
The legislature, in effect, has converted the tort of wrongful discharge into a sort of contract action by the adoption of the Wrongful Discharge From Employment Act. The legislature refused, nonetheless, to provide all the elements of the damages allowable for breach of contract which ordinarily would compensate the party aggrieved for all of the detriment proximately caused by the breach and in the ordinary course of things likely to result therefrom. Section 27-1-311, MCA.
In a recent case, the Supreme Court of Nevada in K-Mart Corporation v. Ponsock (Nev. 1987), 732 P.2d 1364, found the implied covenant of good faith and fair dealing in the employment contract, and stated that even contract damages were inadequate in this type of case. The Nevada Court said:
“In this case we have a contract in which the relationship with the parties is in many ways analogous to those present in an insurance contract. Ponsock was just as dependent in ‘specially relying’ on K-Mart’s commitment to his extended employment and subsequent retirement benefits as is an insurance policyholder dependent on the good faith indemnity promised by the insurance carrier. The special relationships of trust between this employer and this employee under this contract under this kind of abusive and arbitrary dismissal cries out for relief and for a remedy beyond that traditionally *57 flowing from breach of contract. To permit only contract damages as the sole remedy for this kind of conduct would be to render K-Mart totally unaccountable for these kinds of actions. If all a large corporate employer had to do was to pay contract damages for this kind of conduct, it would allow and even encourage dismissals of employees on the eve of retirement with virtual impunity. Having to pay only contract damages would offer little or no determent to the types of practice apparently engaged in by K-Mart in this case. Further, an aggrieved employee, relying on, and anxiously awaiting his retirement benefits should not be made whole by an award of contract damages resulting from wrongful discharge, even if he were awarded the expected retirement benefit . . . After involving itself in a relationship of trust and special reliance between itself and its employee and allowing the employee to rely and depend upon continued employment and retirement benefits, the company, to serve its own financial ends, wrongfully and in bad faith breached the employment agreement. The jury specifically found this reliance and concluded that K-Mart was guilty of bad faith . . .” (Emphasis in original.)
Id., 732 P.2d at 1372.
It is evident that the Wrongful Discharge From Employment Act adopted by the Montana legislature purporting to give a wronged employee some rights, instead, took away any possible right of meaningful recovery. The ominous implications of this Act for all employees not working under a union contract cannot be overstated. The longer the employee works for an employer, the greater reliance the employee places upon the employer’s proffer of fringe benefits and retirement allowances, then the more the employee is at risk to be discharged, because the economic result of a wrongful discharge to the employer, even if the employee’s suit under the Act should be successful, is nothing but paltry damages to the employee and possible profit to the employer. The lack of legislative clout of the unorganized workers, although they may comprise a majority of the workers in this state, is demonstrated in that this patently unfair legislation in 1987 passed the State Senate without a no vote on third reading, and with but 16 no votes out of 100 in the State House of Representatives.
*58 II.
“When law can do no right [Then] it be lawful that law can bar no wrong.”
—■ William Shakespeare, King John (Magna Carta’s John)
Act III, Scene i.
Four centuries ago William Shakespeare stated in capsule the view of the majority of this Court in upholding the Act. The majority view is that the legislature can abolish any right of recovery and when it does courts are barred from awarding “full legal redress” under Art. II, § 16, Montana State Constitution. So holding, the majority airily overrule Pfost v. State (1986), 219 Mont. 206, 713 P.2d 494; White v. State (1983), 203 Mont. 363, 661 P.2d 1272 and Corrigan v. Janney (1981), [192 Mont. 99,] 626 P.2d 838. We submit that not only are these reversals overbroad, but they are clearly in error.
First let us examine the overruled cases. Corrigan v. Janney, supra, involved an appeal from a summary judgment granted in the District Court against a plaintiff in a wrongful death case. Janneys had leased living quarters to the Corrigans, and the leased premises were defectively wired so that Max Corrigan came in contact with the faucet on a bathtub and received an electrical shock which ultimately caused his death. The District Court, reading earlier cases of this Court, decided that there was no cause of action by a tenant against the landlord for such a defect and granted summary judgment. This Court held (Harrison, J.) that there is in modern day usage a need for rental houses to be suitable for human occupation and that a cause of action for wrongful death in this case did exist. The Court cited Art. II, § 16 of the Constitution and went on to state:
“It would be patently unconstitutional to deny a tenant all the causes of action for personal injuries or wrongful death arising out of the alleged negligent management of rental premises by a landlord. If this action were to be taken away, a substitute remedy would have to be provided. Arguably, the repair and deduct statute provides an alternative remedy for damage to the leasehold interest. However, in no way can it be considered an alternative remedy for damages caused by personal injury or a wrongful death.” (Emphasis supplied.)
Id., 626 P.2d at 840.
Justice Harrison then noted a controlling statute and went on to state:
*59 “In summary, we overrule Dier v. Mueller, supra, and hold that our Constitution requires that plaintiff have a form of redress for wrongful death and survivor damages. We hold that § 58-607 R.C.M. (1947), is controlling and that one is responsible for injury occasioned to another by want of ordinary care subject to the defenses and contributory negligence or assumption of risk.”
Id., 626 P.2d at 841.
Thus Corrigan held that § 58-607 provided a statutory basis for recovery in this wrongful death case, and that Art. II, § 16 constitutionally guaranteed the right of redress in that case. Why the majority overrules that case is beyond my conjecture.
In White v. State, supra, Karla White sued the State of Montana alleging that the State was grossly negligent in permitting an allegedly violent and dangerous person to escape from the mental hospital at Warm Springs and to remain free for a period of 5 years without serious attempts to locate and reincarcerate the escapee. Karla was brutally attacked by this individual about 5 years after he had escaped from Warm Springs.
The legislature meanwhile had passed § 2-9-104, MCA, which provided that any governmental unit, including the State, was not liable for noneconomic damages, nor for any economic damages in excess of $300,000 for any one claimant. If this statute were upheld, Karla’s right of recovery, premised upon severe emotional injuries which she received from the attack but insignificant economic damages, would be effectively wiped out. The District Court held that the statutory limitation on governmental liability for damages was unconstitutional and granted summary judgment in favor of Karla. The State appealed to this Court, which said:
“Article II, Section 16 of the Montana Constitution guarantees that all persons shall have a ‘speedy remedy ... for every injury of person, property, or character.’ In Corrigan v. Janney (1981), Montana, [192 Mont. 99,] 626 P.2d 838, this Court held that it is ‘patently unconstitutional’ for the legislature to pass a statute which denies a certain class of Montana Citizens their causes of action for personal injury and wrongful death. We affirm and redefine our holding in Corrigan v. Janney, supra; we hold that the Montana Constitution guarantees that all persons have a speedy remedy for every injury. The language ‘every injury’ embraces all recognized compensable components of injury including the right to be compensated for physical pain and mental anguish and the loss of en *60 joyment of living. Therefore, strict scrutiny attaches.” (Emphasis supplied.)
Id., 661 P.2d at 1275.
In White, this Court found no compelling state interest to classify tortfeasor victims on whether they had been injured by a nongovernment tortfeasor or by a government tortfeasor. The Court struck down a statute which allowed recovery to plaintiffs damaged economically up to $300,000, but totally denied recovery for noneconomic damages; and further, the statute classified victims of government tortfeasors by the severity of the victim’s injuries.
It should be clear to all that § 2-9-104, MCA, denied the equal protection of the law to White because the statute discriminated between tortfeasors injured by government agents or by private defendants; and as between persons injured by government tortfeasors, it discriminated on the basis of economic and noneconomic damages. Certainly this Court in White enforced the state constitutional mandate to courts that “Right and justice shall be administered without . . . denial . . .” Art. II, § 16.
Before adverting to Pfost v. State, supra, we set out for the convenience of the reader the full text of Art. II, § 16, of the State Constitution:
“Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under Workmens’ Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay.” (Emphasis added.)
Pfost v. State involved a plaintiff who had been injured when his truck-tractor collided with a bridge on an extremely icy and hazardous highway. He alleged no precautions had been taken by the State to remedy the hazardous condition although three separate wrecks had occurred prior to Pfost’s arrival. Pfost suffered injuries which eventually made him a quadriplegic. He sought compensatory damages of 6 million dollars. In the meantime, the legislature had adopted a new statute regarding the liability of the State in tort cases, limiting any or all recovery to $300,000 for a single person. Section 2-9-107, MCA. Pfost’s medical expenses alone exceeded that sum. The District Court held the statute to be unconstitutional as a denial of equal protection and the State appealed. In Pfost, we fol *61 lowed White v. State, supra, holding that Art. II, § 16, 1972 of Montana Constitution, granted a fundamental right to access to courts for a full legal redress and on the basis of equal protection found that § 2-9-107, MCA, discriminated improperly between those with minor injuries and those with catastrophic injuries resulting from the tort of a government agent. In passing on the language of Art. II, § 16, supra, we stated:
“The use of the clause ‘this full legal redress’ has major significance. It obviously and grammatically refers to the ‘speedy remedy afforded for every injury of person, property, or character.’ The adjective ‘this’ means the person, thing, or idea that is present or near in place, time, or thought or that has just been mentioned. Websters New Collegiate Dictionary (1981). The constitutional framers thus construed a ‘speedy remedy’ as comprehending ‘full legal redress.’ A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property, or character therefore affects a fundamental right and the State must show a compelling state interest if it is to sustain the constitutional validity of the statute.”
Pfost, 13 P.2d at 503.
The majority object to our grammatical interpretation in Pfost of Art. II, § 16, as “flawed.” Perhaps the majority have rules of grammar of which this writer is unaware, but we will leave it to the teachers of English that the clause “this full legal redress” refers in Art. II, § 16 to the “speedy remedy afforded for every injury of a person, property, or character.” Grammatically, we insist that “speedy remedy” comprehended “full legal redress.”
Speaking in the vein of grammatical construction, the majority ask us to construe the term “full legal redress” in the second sentence of Art. II, § 16 as applying only to injured workmen who have claims against third parties for their injuries. The majority contend that the purpose of the inclusion of the second sentence was only to protect injured workmen and had no effect on the remainder of Art. II, § 16. In this sense, the majority grammatically misconstrue the article. Under its plain language the right of “full legal redress” is not given only to Workers’ Compensation claimants. Rather, the right of “full legal redress” is emphatically granted to Workers’ Compensation claimants too. The framers intended to make certain that included in Art. II, § 16 was a specific provision which also extended the speedy remedy comprehending full legal redress to Workers’ *62 Compensation claimants who might have separate causes of action against third parties, not their employers or fellow employees.
Ashcraft v. The Montana Power Company (1971), 156 Mont. 368, 480 P.2d 812 was the reason for the insertion by the framers of the second sentence in Art. II, § 16, to make certain that Workers’ Compensation claimants had the right of full legal redress, too. Ashcraft was a laborer working for a construction company which as an independent contractor was performing work on the job for the general employer, Montana Power Company. Ashcraft was injured through the alleged negligence of the Montana Power Company. He recovered Workers’ Compensation benefits through his employer, and sought to sue Montana Power Company as a third party tortfeasor. This Court held that Ashcraft had no cause of action for his injuries against the third party tortfeasor, Montana Power Company. Ash-craft and several cases of its progeny following, were at the forefront when Art. II, § 16 was considered by the constitutional framers in 1972. The second sentence of Art. II, § 16 was inserted specifically to overrule Ashcraft.
When the provisions of Art. II, § 16 came before the Constitutional Convention for eventual adoption, Delegate Habedank, as indicated in the majority opinion, made a motion to strike the second sentence of the section upon the grounds that the sentence was merely legislative, and its subject was better left to the legislature. Delegate Habedank’s amendment to delete the second sentence was defeated in the convention, but before the amendment was submitted to a vote, Delegate Habedank made a comment that is interesting in light of this case:
“DELEGATE HABEDANK : Yes, Mr. President [Chairman] you have had the matter very fairly presented to you by Mr. Dahood. As I told you in the first place, I do not particularly oppose this particular amendment, but I have been told that we lawyers are writing the Constitution, trying to slip matters into this Constitution for our own personal gain. You have had the pro of the con given to you. This is something that can’t be corrected by the legislature. You have it in your power to be the supreme Legislature, as the Committee has requested you to do. I leave it to you, but I do think that when you do it, you should do it knowing what you do and not accuse the lawyers of pulling the wool over your eyes.” (Emphasis supplied.)
Verbatim Transcript, page 1758.
Even more interesting in connection with the Constitutional Con *63 vention is that the author of the majority opinion here, a respected member of the Constitutional Convention, stood and opposed Delegate Habedank’s motion to delete the second sentence of Art. II, § 16. He stated:
“DELEGATE McDONOUGH: Mr. Chairman, I also support the committee’s proposal. In Eastern Montana there’s a lot of accidents in the oil field, and practically all the work is subcontracted out or contracted out, and we never dreamed — and Mr. Habedank, I am sure, admits himself he never dreamed, because he’s defended these law suits — that the Supreme Court would rule in this manner. And I support the committee proposal because it just — it was a very bad law and it should be restored.”
Verbatim Transcript, pages 1757, 1758.
There is an inconsistency between the statements of Delegate Mc-Donough in support of Art. II, § 16, and the his statements as the author of the majority opinion as expressed today. If, as he now espouses, Art. II, § 16 gives only a right of access to the courts, but not to a full legal redress, the legislature could make the second sentence of Art. II, § 16, meaningless by simply abolishing the remedies available to third party plaintiffs as they have abolished the tort remedies of the employees in this case. Such a view was unexpressed by any delegate to the Convention. In the light of his opinion today, the commendable efforts of Delegate McDonough to support Art. II, § 16 were not worth the candle. The injured workman now has no more guaranty of a legislature allowing full legal redress than the merest employee relying on implied covenants.
The fundamental right to remedy was expressed to the Constitutional Convention by the chairman of the Bill of Rights Committee, supporting Art. II, § 18 (governmental immunity) when he said:
“We submit it’s an inalienable right to have remedy when someone injures you through negligence and through wrongdoing, regardless of whether he has the status of a governmental servant or not.” (Emphasis added.)
(See Noll and Kenneady v. Bozeman (1975), 166 Mont. 504, 507, 534 P.2d 880, 882). The Jeffersonian word “inalienable” means incapable of being surrendered or transferred. [Webster’s New Collegiate Dictionary (1981)].
Now let us state exactly what Corrigan, White, and Pfost stood for. Corrigan established that when a cause of action is grounded on statute the right of a plaintiff to a full legal redress under that statute was fundamental. White and Pfost established that when a stat *64 ute discriminated invidiously between injured plaintiffs, the courts under Art. II, § 16 would apply exacting scrutiny to determine the necessity, if any, for the discrimination. Those results were commanded by the language of Art. II, § 16.
A major premise of the majority opinion is that Art. II, § 16 is addressed to the courts, and because the section is not addressed to the legislature, the legislature is free to act without restraint except for a minimal rational test. That concept ignores the last sentence of Art. II, § 16, which tells the courts that “right and justice shall be administered without denial.” The courts must consider first the right and then justice, and neither must be denied.
A full legal remedy, state the majority, is not a fundamental right; and so bring themselves to deny the essence of a fundamental right. The right of a citizen to claim justice from his state, is, we should agree, a fundamental right; else the right of petition for redress from grievances is meaningless. State protection of citizens from injustice, a fortiori, is also a fundamental right; else the right of petition is toothless.
A legal remedy that delivers only 25% justice automatically also delivers 75% injustice. Assuming a wrong-doing employer, a legal remedy that delivers to the long-term employee only four working years of justice delivers also the balance of a working lifetime of injustice. For justice is not divisible. Either the result is just or it is unjust, just as a single fact is true or else it is untrue. There is no middle to justice, for injustice takes up where partial justice ends. In defining justice, we do not mess with Mr. In-Between. As surely as there are fundamental rights, there are surely no fundamental half-rights. The right of access to courts is only part of the fundamental right; the right to a full legal remedy completes the part to make a whole. The two, access to the courts and full redress, indivisibly make one fundamental right, and together they are the essence of justice. They must coexist to complete the fundamental right to justice.
The least plausible argument of the majority in this case is that the legislature has the power to limit remedies, and that this Court may not interfere if the legislature so acts. If this were true in all cases, the public in this state would have no protection from free-wheeling legislatures. Fortunately, if the Court does its job, our state constitutional system is designed to contain legislative action within constitutional limits. That design requires the state courts to rein in a rampant legislature. Especially must an appellate court (in Montana *65 the only appellate court is this Court) be watchful to safeguard the rights of the public in state constitutional disputes.
Our appellate jurisdiction has a two-fold purpose: First, we assure state litigants that the decision makers at the first level, the district courts, will make correct decisions, not in isolation, but with the connected support of the state legal system. The review for correctness reinforces the dignity and acceptability of the trial court’s decisions, and controls any adverse effects of shortcomings at the first level. The second purpose of this appellate court is equally important. Our institutional review of the workings of trial courts serves to announce, clarify and harmonize the rules of decision and the application of laws in the state legal system. Necessarily, institutional review is both creative and political; to say that legislatures, and not courts, make law ignores the facts of appellate life.
The final arbiter of what the state law in Montana shall be is this Court, under Art. II, § 16, not the legislature. We are given that power, to be used judicially. The Justices in the majority do not seem to realize it, but in approving without objection or by inaction the Wrongful Discharge From Employment Act of 1987, they are making law. They have blessed what should be repugnant to a court — a savage curtailment of redress for wrongs, and they excuse their inaction by ceding overall power to the legislature. Though the State Constitution requires courts of justice (not the legislature) to afford a speedy remedy for every injury of person, of property, or of character, the majority have taken a detour from the road to remedy. They have declined to insist on not only on speedy remedy, but on full legal redress for wrongfully discharged employees. They have made law by being passive, and deserve no praise. A toothless court, when abstaining from its duty, is making law and is as great a threat to a just government as an unrestrained legislature.
This is not to say that this Court sits as a super legislature, governing by its discretion the policy, wisdom, and direction of legislative acts. When, however, the legislature acts invidiously to discriminate between persons similarly situated, as will be demonstrated below, Art. II, § 16 imposes a duty upon this Court to make certain that right and justice are not denied.
III.
Having determined that Meech has no fundamental right to a full legal redress here, the majority sustain the equal protection implica *66 tions of the Wrongful Discharge From Employment Act by applying the rational test. This leads the majority to the irrational result that it is rational to make the state safe for unscrupulous employers.
The legislature made no findings to accompany the Act, nor does the Act itself articulate its purpose. The statements by the majority as to the purpose of the Act are extrapolated from written statements of proponents submitted to the committees considering the Act, and not the whole legislature.
At its core, the Wrongful Discharge From Employment Act is nothing more than a cap on recoverable damages available to wronged employees. In that sense, the type of law we are looking at here is no different than the types presented to us in White and Pfost, supra.
To begin with, the at-will statute which formerly governed employee relationships in Montana is not really repealed in the Act. The same language as existed in § 39-2-504, MCA, is included in § 2 of the Act. At-will employees still exist in Montana.
We should also put out of the way any argument that the Act discriminates with respect to punitive damages to the extent that they are allowed under the Act. The test of punitive damages in § 5(2) of the Act is the same test faced by any plaintiff claiming punitive damages under § 27-1-221, MCA.
The Wrongful Discharge From Employment Act cannot be sustained as an equal protection under the rational basis test because it discriminates adversely between persons similarly situated and it discriminates vertically as well as horizontally.
Equal protection permits reasonable classifications only if those similarly situated in relevant respects are treated similarly. An Act is excessively underinclusive if it excludes persons who are similarly situated.
The majority opinion does not begin to state the number of ways in which employees similarly situated are discriminated against under the Wrongful Discharge From Employment Act. Horizontally, the discriminations include at least these:
1. A union worker is not affected by the Act; only non-union workers are covered. Thus a union worker who is discharged for “whistle blowing” has larger rights of recovery than a non-union worker discharged for the same reason.
2. Workers whose discharge is the result of a violation of the Human Rights Act, the Equal Employment Opportunity Act, the Pension Reform Act of 1974 (ERISA), the Pregnancy Disability Act *67 and any number of other state or federal acts are not covered under the Wrongful Discharge From Employment Act. Such employees’ full rights of recovery are not taken away under this Act (see for example, Drinkwalter v. Shipton Supply Company, Inc. (Mont. 1987), [225 Mont. 380], 732 P.2d 1335; Breese v. Steel Mountain Enterprises, Inc. (1986), 220 Mont. 454, 716 P.2d 214; and Strong v. State (1979), 183 Mont. 410, 600 P.2d 191).
3. The Act discriminates against long term employees by severely limiting their damages which might be large in magnitude. See Flanigan v. Prudential Federal Savings and Loan (1986), 221 Mont. 419, 720 P.2d 257.
4. A worker on probation is entirely precluded from any action for wrongful discharge.
In addition, the Act is vertically discriminatory in that it imposes upon wrongfully discharged employees the burden of subsidizing a better business climate for wrongdoing employers.
It is not a legitimate state purpose to protect employers from their unscrupulous acts as against the traditional rights of individuals to earn their livelihood. Our state constitution includes among inalienable rights “pursuing life’s basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities.” Art. II, § 3, 1972 Mont. Const.
Thus, no case can be made on a rational basis to sustain a law the principal purpose of which is to subsidize, protect or enhance the acts of wrongdoers.
Because of its manifest discrimination, because it serves no legitimate state purpose, and because it cannot survive a proper balancing test as between the rights of employers and of individuals to pursue life’s basic necessities, the Wrongful Discharge From Employment Act of 1987 violates the Equal Protection Clause of the 1972 Montana Constitution,'Art. II, § 4.
As stated in Richardson v. Carnegie Library Restaurant, Inc. (1988), 107 N.M. 688, 763 P.2d 1153:
“We commence our examination by repeating that the court of appeals erred in its equal protection analysis of the damage limitation. A legislative classification not only must affect equally all persons within the class to which the legislation applies but, to begin with, the legislature must have a legitimate purpose for creating the class, and a constitutionally permissible reason for treating persons within *68 that class differently from those without. See McLaughlin v. Florida, 379 U.S. 184, 190, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964)”
<< >>
Id., 763 P.2d at 1164.
IV.
Generally, when a legislative act is invalid because of a discrimination, the act also violates other provisions of the state constitution. That is true in this case. The majority dismisses without proper discussion the due process implications of the Wrongful Discharge From Employment Act.
It is usually a due process argument that an Act which limits the rights of recovery of injured parties must provide a reasonably adequate substitute, or quid pro quo, as the majority calls it. The majority, having adopted the irrational conclusion that the Wrongful Discharge From Employment Act was valid, is driven to a further irrationality in determining that the substitution of mitigated recovery provided to wronged employees in the Act was adequate. Not unlike Polonious in Hamlet, the majority can find in a cloud a camel’s shape, a weasel’s, or very like a whale.
In determining the adequacy of the substituted recovery in the Act, the majority confined itself to examination of the mitigated four years of damages as against what might be recovered for loss of wages or fringe benefits. The majority paid no attention in determining adequacy to the elimination of compensatory damages, damages for emotional or mental distress, and damages arising from the breach of the implied covenant of good faith and fair dealing. By so examining, the majority managed to escape the best indication of the inadequacy of the recoverable damages in the Act demonstrated by the cases that have come to this Court. The results in such cases as Flanigan, supra, Strong v. State, supra, and Stark v. The Circle K Corporation (1988), [230 Mont. 468,] 751 P.2d 162, show the injury done by the Act to plaintiffs through the elimination of common law tort remedies. The Act simply does not survive an adequacy test when properly admeasured against the former law in Montana.
Other constitutional provisions probably affected by the majority decision but not referred to by the majority opinion and thus not pertinent to this dissent are the right to trial by jury, and the privilege and immunity clauses of the state constitution. Art. II, § 26; *69 Art. II, § 31, 1972 Mont. Const. Oregon looks to Art. I, § 20 of its constitutional Privileges and Immunities Clause rather than to equal protection tests to determine the validity of a statute. There the court inquires into whether the challenged statute affects a “privilege or immunity” — that is, “some advantage” to which a person “would be entitled but for a choice made by government authority.” Salem v. Bruner (1985), 299 Or. 262, 702 P.2d 70, 74. In a recent case in Washington, Sophie v. Fireboard Corporation (1989), 112 Wash.2d 636, 771 P.2d 711, the Supreme Court of that state found, because of the language in Washington’s Tort Reform Act, a violation of the state constitutional provision of the right to trial by jury. Arguments with respect to similar clauses in our state constitution could be made in this case, but were not raised in briefs nor decided by the majority. They are therefore open to future discussions.
V.
If Art. II, § 16 of the Montana Constitution does anything, it imposes upon the judiciary the duty to guard the state constitution. In its decision today, this Court sidesteps that duty and reverses not only the cases mentioned in the majority opinion but a long line of cases in the past 15 years that have established solid boundaries for employers and employees, while adhering to the at-will principle declared in our statutes. In yielding our duty to the vagaries of the legislature, we have disadvantaged a large portion of the Montana labor market in the guise of a better business climate. The Wrongful Discharge From Employment Act of 1987 is economically and socially regressive. The majority opinion is legally regressive. Because of the unwillingness of the majority to act properly in a constitutional case, regressiveness is the order of the day.
I would hold the Wrongful Discharge From Employment Act of 1987 to be invalid on the basis that under an equal protection test it cannot meet even a rational scrutiny. The only basis for the Act that I can find is that as between business and the workers, the legislature discriminatingly prefers business. That is not a constitutional basis on which to found a statute.
MR. JUSTICE HUNT concurs in the dissent of MR. JUSTICE SHEEHY.
*70 EXHIBIT A
CHAPTER NO. 641
AN ACT PROVIDING A PROCEDURE AND REMEDIES FOR WRONGFUL DISCHARGE; AUTHORIZING ARBITRATION AS AN ALTERNATIVE; ELIMINATING COMMON-LAW REMEDIES; REPEALING SECTIONS 39-2-504 AND 39-2-505, MCA; AND PROVIDING AN APPLICABILITY CLAUSE AND AN EFFECTIVE DATE.
Be in enacted by the Legislature of the State of Montana:
Section 1. Short title. [ §§ 1 through 9] may be cited as the “Wrongful Discharge From Employment Act”. [ § 39-2-901]
Section 2. Purpose. [ §§ 1 through 9] set forth certain rights and remedies with respect to wrongful discharge. Except as limited in [ §§ 1 through 9], employment having no specified term may be terminated at the will of either the employer or the employee on notice to the other for any reason considered sufficient by the terminating party. Except as provided in [ § 7], [ §§ 1 through 9] provide the exclusive remedy for a wrongful discharge from employment. [ § 39-2-902]
Section 3. Definitions. In [ §§ 1 through 9], the following definitions apply:
(1) “Constructive discharge” means the voluntary termination of employment by an employee because of a situation created by an act or omission of the employer which an objective, reasonable person would find so intolerable that voluntary termination is the only reasonable alternative. Constructive discharge does not mean voluntary termination because of an employer’s refusal to promote the employee or improve wages, responsibilities, or other terms and conditions of employment.
(2) “Discharge” includes a constructive discharge as defined in Subsection (1) and any other termination of employment, including resignation, elimination of the job, layoff for lack of work, failure to recall or rehire, and any other cutback in the number of employees for a legitimate business reason.
(3) “Employee” means a person who works for another for hire. The term does not include a person who is an independent contractor.
(4) “Fringe benefits” means the value of any employer-paid vacation leave, sick leave, medical insurance plan, disability insurance *71 plan, life insurance plan, and pension benefit plan in force on the date of the termination.
(5) “Good cause” means reasonable, job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer’s operation, or other legitimate business reason.
(6) “Lost wages” means the gross amount of wages that would have been reported to the internal revenue service as gross income on Form W-2 and includes additional compensation deferred at the option of the employee.
(7) “Public policy” means a policy in effect at the time of the discharge concerning the public health, safety, or welfare established by constitutional provision, statute, or administrative rule. [ §§ 39-2-903(l)-(7), inc.]
Section 4. Elements of wrongful discharge. A discharge is wrongful only if:
(1) it was in retaliation for the employee’s refusal to violate public policy or for reporting a violation of public policy;
(2) the discharge was not for good cause and the employee had completed the employer’s probationary period of employment; or
(3) the employer violated the express provisions of its own written personnel policy. [ § 39-2-904]
Section 5. Remedies. (1) If an employer has committed a wrongful discharge, the employee may be awarded lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge, together with interest thereon. Interim earnings, including amounts the employee could have earned with reasonable diligence, must be deducted from the amount awarded for lost wages.
(2) The employee may recover punitive damages otherwise allowed by law if it is established by clear and convincing evidence that the employer engaged in actual fraud or actual malice in the discharge of the employee in violation of [ § 4(1)].
(3) There is no right under any legal theory to damages for wrongful discharge under [ §§ 1 through 9] for pain and suffering, emotional distress, compensatory damages, punitive damages, or any other form of damages, except as provided for in Subsections (1) and (2). [ § 39-2-905]
Section 6. Limitation of actions. (1) An action under [ §§ 1 through 9] must be filed within 1 year after the date of discharge.
(2) If an employer maintains written internal procedures, other than those specified in [ § 7], under which an employee may appeal a discharge within the organization structure of the employer, the *72 employee shall first exhaust those procedures prior to filing an action under [ §§ 1 through 9]. The employee’s failure to initiate or exhaust available internal procedures is a defense to an action brought under [ §§ 1 through 9]. If the employer’s internal procedures are not completed within 90 days from the date the employee initiates the internal procedures, the employee may file an action under [ §§ 1 through 9] for purposes of this subsection the employer’s internal procedures are considered exhausted. The limitation period in Subsection (1) is tolled until the procedures are exhausted. In no case may the provisions of the employer’s internal procedures extend the limitation period in Subsection (1) more than 120 days.
(3) If the employer maintains written internal procedures under which an employee may appeal a discharge within the organizational structure of the employer, the employer shall within 7 days of the date of the discharge notify the discharged employee of the existence of such procedures and shall supply the discharged employee with a copy of them. If the employer fails to comply with this subsection, the discharged employee need not comply with Subsection (2) [ § 39-2-911]
Section 7. Exemptions. [Sections 1 through 9] do not apply to a discharge:
(1) that is subject to any other state or federal statute that provides a procedure or remedy for contesting the dispute. Such statutes include those that prohibit discharge for filing complaints, charges, or claims with administrative bodies or that prohibit unlawful discrimination based on race, national origin, sex, age, handicap, creed, religion, political belief, color, marital status, and other similar grounds.
(2) of an employee covered by a written collective bargaining agreement or a written contract of employment for a specific term. [ § 39-2-912]
Section 8. Preemption of common-law remedies. Except as provided in [ §§ 1 through 9], no claim for discharge may arise from tort or express or implied contract [ § 39-2-913]
Section 9. Arbitration. (1) Under a written agreement of the parties, a dispute that otherwise could be adjudicated under [ §§ 1 through 9] may be resolved by final and binding arbitration as provided in this section.
(2) An offer to arbitrate must be in writing and contain the following provisions:
*73 (a) A neutral arbitrator must be selected by mutual agreement or, in the absence of agreement, as provided in 27-5-211.
(b) The arbitration must be governed by the Uniform Arbitration Act, Title 27, chapter 5. If there is a conflict between the Uniform Arbitration Act and [ §§ 1 through 9], [ §§ 1 through 9] apply.
(c) The arbitrator is bound by [ §§ 1 through 9].
(3) If a complaint is filed under [ §§ 1 through 9], the offer to arbitrate must be made within 60 days after service of the complaint and must be accepted in writing within 30 days after the date the offer is made.
(4) A party who makes a valid offer to arbitrate that is not accepted by the other party and who prevails in an action under [ §§ 1 through 9] is entitled as an element of costs to reasonable attorney fees incurred subsequent to the date of the offer.
(5) A discharged employee who makes a valid offer to arbitrate that is accepted by the employer and who prevails in such arbitration is entitled to have the arbitrator’s fee and all costs of arbitration paid by the employer.
(6) If a valid offer to arbitrate is made and accepted, arbitration is the exclusive remedy for the wrongful discharge dispute and there is no right to bring or continue a lawsuit under [ §§ 1 through 8]. The arbitrator’s award is final and binding, subject to review of the arbitrator’s decision under the provisions of the Uniform Arbitration Act. [ § 39-2-914]
Section 10. Repealed. Sections 39-2-504 and 39-2-505, MCA, are repealed.
Section 11. Severability. If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.
Section 12. Applicability. This act applies to claims arising after the effective date of this act.
Section 13. Effective date. This act is effective July 1, 1987.
Approved May 11, 1987.